## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HEIDI SROKA,                                )
                                            )
                    Plaintiff,              )
                                            )
        vs.                                 )        Civil Action No. 3:19-cv-45
                                            )        Judge Stephanie L. Haines
PENNSYLVANIA DEPARTMENT OF                  )
CORRECTIONS, et al.,                        )
                                            )
                    Defendants.             )

## <u>OPINION AND ORDER</u>

Plaintiff Heidi Sroka ("Plaintiff") initiated the instant action by filing a complaint on March 15, 2019 (ECF No. 1). Plaintiff alleges that Defendant Pennsylvania Department of Corrections ("Defendant DOC"), her former employer, and Defendant Trevor Wingard ("Defendant Wingard"), her former supervisor, violated her right to be free from discrimination based on her age and sex in violation of the Pennsylvania Human Relations Act, 43 P.S. §951, *et seq*. ("PHRA"), Title VII, 42 U.S.C. §2000e, *et seq*., the Equal Protection Clause of the Fourteenth Amendment, pursuant to 42 U.S.C. §1983, and the Equal Pay Act of 1963, 29 U.S.C. §206, *et seq*. (ECF No. 1 at ¶1). Plaintiff further contends that Defendants violated her right to be free from retaliation for engaging in protected conduct in violation of the PHRA, Title VII, and the Equal Protection Clause of the Fourteenth Amendment. *Id.*

Pending before the Court is Defendants' Motion for Summary Judgment (ECF No. 43) which seeks judgment in favor of Defendants on all of Plaintiff's claims. For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 43) will be GRANTED IN PART and DENIED IN PART. Defendants' motion is GRANTED as to Plaintiff's PHRA claim

against Defendant DOC at Count I, Plaintiff's Title VII wage-based discrimination claim against Defendant DOC at Count III, Plaintiff's wage-based discrimination and retaliation claims pursuant to Section 1983 against Defendant Wingard at Count IV, and Plaintiff's claims against Defendant DOC under the Equal Pay Act of 1963, 29 U.S.C. §206, *et seq.* at Count V. Defendants' motion is DENIED as to all remaining claims.

## I.    Factual and Procedural History

Plaintiff began working for Defendant DOC as a budget analyst in January 1994 (ECF No. 44 at ¶1). Plaintiff became the Corrections Superintendent Assistant ("CSA") at State Correctional Institution-Somerset ("SCI Somerset") in July 2003 and held that role until her termination on July 10, 2017. *Id.* at ¶2. Plaintiff was 55 years old when her employment with Defendant DOC ended. *Id.* at ¶3. Defendant Wingard became superintendent of SCI Somerset in 2014 (ECF No. 53 at ¶5). Throughout her 21 years of employment with Defendant DOC, Plaintiff did not receive an unfavorable performance review and had received favorable reviews from Defendant Wingard. *Id.* at ¶3. Defendant Wingard was forty-eight years old at all times relative to this action (ECF No. 44 at ¶74).

The core duties of the CSA relate to administrating the inmate grievance system (originally known as the inmate complaint system), maintaining accreditation, and managing public information (ECF No. 44 at ¶6). The CSA job description relating to the time at issue in the Complaint states that CSA responsibilities required making daily trips to each Restricted Housing Unit ("RHU") pod and dining hall to retrieve inmate grievances in lockboxes. *Id.* at ¶9. The inmates must be able to access these boxes, and the boxes were located on the other side of the pod from the entrance to the pod. *Id.* at ¶11. Plaintiff states the inmates use the grievance system for any issue they have in the institution, which Defendants represent can be for issues that are

severe or safety related (ECF No. 52 at ¶12).  Inmates can file grievances through the mail or by

handing them to an officer, but the majority of grievances came through the inmate drop boxes

(ECF No. 44 at ¶14).  One of Plaintiff's duties as a CSA was to collect the grievances from the

boxes located in each RHU pod, number them, and assign them to a grievance officer to

investigate.  *Id.* at ¶15.  Plaintiff had an assistant, Tessa Deem ("Deem"), to whom she delegated

some of these tasks (ECF No. 52 at ¶15).

Plaintiff testified at her deposition that when she would collect the grievances from the

boxes, the inmates would yell sexually explicit obscenities at her and describe in detail the sex acts

they wanted to perform on her (ECF No. 52 at ¶32).  In 2017, SCI Somerset had four RHU pods

(ECF No. 53 at ¶28).  Plaintiff testified at her deposition that, on each pod, the grievance box was

located across the pod from the entrance, approximately 100 yards away.  *Id.*  Defendants indicate

that inmates in the RHU are at all times either inside their cells or chained up with handcuffs and

leg shackles (ECF No. 44 at ¶27), however, Plaintiff states that the inmates in the RHU were not

shackled around their legs (ECF No. 52 at ¶27).

Plaintiff testified at her deposition Defendant Wingard was aware of the harassment and

that she had discussed it with him at least ten times (ECF No. 53 at ¶35).  At his deposition,

Defendant Wingard testified:

Q. Did Ms. Sroka ever complain to you about sexual harassment that she was receiving
from inmates at the institution?

A. I vaguely recall conversations, but I don't remember any specifics about those
conversations.

\*\*\*

A. I believe that she made a complaint or allegations to me or someone in my chain of
command that inmates were yelling names at her when she went into specific areas of the
facility, and that is off of a memory from three years ago, but that is what I believe.

ECF No. 46-4 at pp. 67-68.

Defendant Wingard testified he didn't recall making any adjustments or doing anything to address her allegations. *Id.* at pp. 68-69.

Plaintiff testified she informed Defendant Wingard she wanted the grievance boxes relocated so she would not have to endure sexual harassing comments from the inmates when she went to retrieve the grievances from the boxes (ECF No. 53 at ¶38). Specifically, Plaintiff testified:

Q. Did you tell him why you wanted the boxes moved?

A. Yes.

Q. And what reason did you tell him?

A. Because of the sexual harassment. And I said it would be a lot less if I had them moved by the mailboxes near the front of the RHU pod.

ECF No. 46-1 at pp. 135- 6.

Plaintiff testified she informed Defendant Wingard that if the boxes were moved, she could go into the pod and retrieve the grievances without the inmates noticing her (ECF No. 53 at ¶38). Plaintiff also told Defendant Wingard that other institutions placed the grievance boxes next to the inmate mail boxes. *Id.* She also testified she asked Wingard to move the grievance boxes at least five or six times. *Id.*

Defendants deny Plaintiff requested the grievance boxes to be moved because Plaintiff was experiencing sexual harassment from the inmates, but acknowledge Plaintiff requested the grievance boxes be moved on March 6, 2017 and again on March 10, 2017, in emails to Defendant Wingard (ECF No. 44 at ¶21). On March 6, 2017, Plaintiff sent Defendant Wingard an email asking if the grievance boxes could be moved while maintenance employees were doing other work in the RHU (ECF No. 53 at ¶52). Wingard did not respond to this email (ECF No. 53 at ¶42). On March 10, 2017, Plaintiff sent Defendant Wingard another email asking that the boxes

be moved while maintenance employees were available to do so, however, he replied, "No, we are leaving them where they are." *Id.* at ¶43.

Plaintiff also testified that, after she sent the March 6, 2017 email, Defendant Wingard seemed angry with her for bothering him about the issue and made a comment implying that her desire to relocate the grievance boxes was inappropriately connected to wanting to be near the inmate showers (ECF No. 53 at ¶44). Defendant Wingard disputed he had made such a comment in his deposition testimony (ECF Nos. 44 at ¶43). At his deposition, Defendant Wingard testified he assumed Plaintiff wanted the grievance boxes to be moved because she didn't like walking the extra distance (ECF No. 53 at ¶39).

Defendant Wingard testified he did not take any actions to determine if the grievance boxes could be relocated (ECF No. 53 at ¶40). He also testified at his deposition that if grievance boxes were placed near the showers as Plaintiff had requested, the steam would continually ruin the paper (ECF No. 53 at ¶40). Plaintiff points out that the mailboxes are located approximately 50 feet from the showers and the steam from the showers does not affect the inmate mail. *Id.*

Around this same time period, according to the deposition testimony of Plaintiff's assistant Tessa Deem, on March 1, 2017, Plaintiff picked up grievances from the RHU pods but then told Deem that such a quantity of grievances could not have been placed in the drop boxes that day, March 1, 2017, as the prison was on lock-down that day, so Deem should backdate them by stamping them with the date of the previous day, February 28, 2017. *Id.* at ¶60. Deem testified she was aware Plaintiff had not collected the inmate grievance forms on February 28, 2017 and recognized the order to backdate as inappropriate. *Id.* at ¶61. Deem testified that when Plaintiff returned from lunch, she picked up the roughly 30 grievance forms and the date stamper and took them into her office. *Id.* at ¶62. The forms at issue bear the date of February 28, 2017. *Id.* at ¶70.

Plaintiff testified she had no recollection of having instructed Deem to backdate the grievance forms, and that the standard practice was for Deem to date the grievance forms with the date on which they were collected (ECF No. 52 at ¶60).

At his deposition, Defendant Wingard testified he found out about the backdating situation from Deem and he reported it to his supervisor, Steven Glunt, within the next 24 hours (ECF No. 53 at ¶48). However, based on the timeline of when Deem testified she informed Defendant Wingard of the situation, it appears he may have learned of the situation as early as the week of March 3, 2017, and Defendant Wingard did not email his report of the incident to Glunt until March 13, 2017. *Id.* at ¶49. Plaintiff points out that Monday, March 13, 2017, was the first working day following Plaintiff's Friday, March 10, 2017 email request to move the grievance boxes. *Id.*

Darren Fisher from Defendant DOC's Office of Special Investigations and Intelligence ("OSII") was referred the allegations of misconduct against Plaintiff (ECF No. 52 at ¶66). Deem was interviewed on April 14, 2017 regarding the backdating allegations (ECF No. 53 at ¶53). Defendant Wingard attended the OSII interview with Deem, per Deem's request that he be present for the interview, and the interview took place in his office (ECF No. 53 at ¶¶53-54).

Plaintiff was interviewed by Fisher and another OSII employee on May 2, 2017, which is when Plaintiff first became aware she was accused of misconduct (ECF No. 53 at ¶57). During her interview with Fisher, Plaintiff admitted there were days when she did not have time to retrieve grievance forms (ECF No. 53 at ¶58). At one point during the interview, the investigators indicated that, if the grievances became involved in a lawsuit, Plaintiff could be facing criminal charges over the backdating. *Id.* at ¶59. The OSII employees stated during the interview they had found numerous instances, going back months, when Plaintiff had not entered the RHU to collect

grievance forms and that those grievance forms had all been backdated. *Id.* However, the record contains only the approximately 30 grievance forms with the February 28, 2017 date stamp. Ultimately, Plaintiff drafted a statement apologizing for not retrieving grievances from the RHU every day and accepting responsibility for the backdated grievances, which Plaintiff contends she did in an effort to save her job (ECF No. 53 at ¶62). Defendant Wingard did acknowledge he regularly reviewed logs that showed when employees entered the RHU, and the record indicates Defendant Wingard had not previously identified any issue with how often Plaintiff entered the RHU pods (ECF No. 53 at ¶24).

Plaintiff testified she was never informed that retrieving inmate grievances from the RHU on a daily basis was a priority (ECF No. 53 at ¶25). At his deposition, Defendant Wingard stated he did not believe there was a DOC policy that would require grievances be date stamped when they were picked up (ECF No. 53 at ¶ 46). Approximately three weeks after Plaintiff's termination, Defendant Wingard decided that date stamping grievances at SCI Somerset was probably not needed and ended the practice. *Id.* at ¶89. It is undisputed that inmate grievances were not picked up on weekends, and there were instances where up to four calendar days could elapse between grievance retrievals (ECF No. 52 at ¶13). Defendant Wingard stated he was not aware of an instance where an inmate was injured as a result of a grievance not being picked up on the date it was submitted. *Id.*

While Plaintiff was being interviewed by the investigators on May 2, 2017, Defendant Wingard sent an email to his supervisor, Steve Glunt, to ask if he could accept Plaintiff's resignation (ECF No. 53 at ¶65). Plaintiff did not tender her resignation but the OSII investigators also provided Defendant Wingard with updates on the status of the investigation. *Id.* at ¶66. Plaintiff asserts that this was not standard procedure, arguing that an employee could be prejudiced

if OSII discloses information about an investigation to a supervisor who is involved in the disciplinary process. *Id.* Defendant Wingard passed this information onto his deputy, Deputy Superintendent Hainsworth, who would later serve on the Pre-Disciplinary Conference ("PDC") Panel convened as part of the investigation into the backdating incident. *Id.* at ¶67.

On May 11, 2017, Plaintiff filed a complaint with Defendant DOC's internal EEO office alleging Defendant Wingard had subjected her to age discrimination and had failed to respond to her complaints of sexual harassment by inmates. *Id.* at ¶68. Plaintiff testified she filed the complaint because both her training about discrimination and harassment, as well as her recent interview by OSII, caused her to believe she was a target of discrimination and harassment (ECF No. 52 at ¶72). Defendants state Defendant DOC completed an investigation which found no evidence Plaintiff was discriminated against on the basis of her age or any other protected class (ECF No. 44 at ¶73). Plaintiff contends Defendant DOC only investigated Plaintiff's claims of age discrimination, and it did not investigate her claims of sexual harassment by inmates or her claims that Defendant Wingard failed to adequately address that harassment or investigate any claims of retaliation (ECF No. 52 at ¶73).

On May 16, 2017, Defendant Wingard was notified of Plaintiff's EEO complaint (ECF No. 53 at ¶70). In an email dated May 17, 2021, his supervisor, Steve Glunt, told Defendant Wingard he had seen such investigations in response to employees being under investigation. *Id.*; (ECF No. 54-12). On May 30, 2017, Defendant Wingard ordered a PDC Panel be convened with regard to the allegations against Plaintiff (ECF No. 53 at ¶71). Plaintiff received notification that the charges against her would result in a PDC to occur on June 9, 2017, in order to look at the charges against her and decide if the charges were substantiated or not (ECF No. 44 at ¶65, 67). The charges against Plaintiff were violations of DOC Code of Ethics Sections B10, B22, and B29, as well as

violating DOC Administrative Manual 804, Inmate Grievance Systems Procedures Manual, Section 1, Grievance and Initial Review, Subsection (B)(4)(c) and the Position Description Duties of CSA. *Id.* at ¶68.  At the PDC, Fisher presented the following conclusions from the investigation: that Plaintiff had instructed Deem to place the date February 28, 2017, on grievances that were collected on March 1, 2017, and that the system that logs access to the facility showed that on dozens of occasions, including on February 28, 2017, Plaintiff did not enter the facility at all and thus could not have completed her duty of collecting inmate grievance forms daily.  *Id.* at ¶69. The PDC substantiated all of the charges against Plaintiff.  *Id.* at ¶73.

On June 23, 3017, Plaintiff discovered a grievance form which had been signed and dated with Defendant Wingard's signature on a day he was not in the institution.  *Id.* at ¶82.  Plaintiff forwarded this document to Glunt and the head of OSII, James Barnacle.  *Id.*  Glunt sent Barnacle an email informing him that Plaintiff was "pending dismissal" and suggesting that Barnacle "follow up as you deem appropriate."[1]  *Id.* at ¶83.  Defendant Wingard testified he determined Deem had predated the grievance form and forgotten to have it signed by him, causing the grievance response to be backdated when Defendant Wingard signed it four days later.  If the grievance response had been correctly dated, it would have been untimely, however, neither Defendant Wingard nor Deem were disciplined.  *Id.* at ¶¶84-5.  It was determined that Defendant Wingard did not intentionally misdate the document (ECF No. 44 at ¶86), and on that basis, the allegation was deemed "unfounded" (ECF No. 53 at ¶87).  Plaintiff also points out that the minutes from her PDC were backdated by Human Resources Officer Donald Talley with the date June 9,

---

[1] Based on the language of the email, it appears Glunt was aware on June 23, 2017 that Plaintiff would be dismissed even before Defendant Wingard received the Secretary's range of discipline on July 6, 2017.

2017, though he completed the minutes on June 13, 2017 (ECF No. 53 at ¶77). Talley also faced no discipline.

Following the investigation, in a letter dated July 6, 2017, Defendant DOC's Human Resources Director, Ty Stanton, presented Defendant Wingard with a range of sanctions which he was authorized to impose on Plaintiff. *Id.* at ¶78. The range of sanctions were the options of "Dismissal or Level 2 ADLS with Final Warning." *Id.* The letter further provided that Defendant Wingard may deviate from the normal range of sanctions, but if he does so, he must submit a report of the rationale for deviation in advance of the imposed discipline and the appropriate Deputy Secretary and approval must be given for such deviation. *Id.* Though disputed by Defendants in their briefing, Defendant Wingard testified he had the authority to choose from among the possible sanctions presented to him, and Defendant Wingard chose to terminate Plaintiff. *Id.* at ¶79-80; (ECF No. 46-4 at p. 206).

Plaintiff does not dispute the charges against her were violations of Defendant DOC's Code of Ethics Sections B10, B22, and B29, as well as violating DOC Administrative Manual 804, Inmate Grievance Systems Procedures Manual, Section 1, Grievance and Initial Review, Subsection (B)(4)(c) and the Position Description Duties of CSA (ECF No. 52 at ¶68). Defendants maintain that Plaintiff's conduct was so egregious that dismissal was warranted. Plaintiff contends the basis for her termination was pretextual.

On November 16, 2020, Defendants filed the instant Motion for Summary Judgment (ECF No. 43), Concise Statement of Material Facts (ECF No. 44), Brief in Support of Motion for Summary Judgment (ECF No. 45), and Appendix to Defendants' Concise Statement of Material Facts (ECF No. 46). Following the Court granting Plaintiff extensions to respond to Defendants' Motion for Summary Judgment (ECF Nos. 48 and 50), on January 22, 2021, Plaintiff filed her

Response to the Motion for Summary Judgment (ECF No. 51), Response to Defendants' Statement of Material Facts (ECF No. 52), Plaintiff's Statement of Additional Material Facts (ECF No. 53), and Appendix to Plaintiff's Statement of Additional Material Facts (ECF No. 54).  The Court granted Defendants an extension of time to file a reply (ECF No. 56), and on February 11, 2021, Defendants filed their Reply to Plaintiff's Response to Motion for Summary Judgment (ECF No. 57).  The Court granted Plaintiff leave to file a surreply (ECF No. 61), and on March 9, 2021, Plaintiff filed her Surreply to Defendants' Reply in Support of Motion for Summary Judgment (ECF No. 62).  The Motion for Summary Judgment (ECF No. 43), having been fully briefed, is now ripe for disposition by the parties.

## II.    Standard of Review

In relevant part, Rule 56 provides:

> A party may move for summary judgment, identifying each claim or defense...on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.
> ...
> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by...citing to particular parts of materials in the record...or...showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(a), (c).

After discovery and upon a motion, Rule 56 requires the entry of summary judgment against a party who "'fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.'" *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could decide it in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."  *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Anderson*, 477 U.S. at 248; *Celotex Corp.*, 477 U.S. at 322-23)).

Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial.  *Celotex*, 477 U.S. at 324.  The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings.  *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).  However, in deciding a Rule 56 summary judgment motion, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences and resolve all doubts in its favor.  *Woodside v. Sch. Dist. of Phila. Bd. of Educ.*, 248 F.3d 129, 130 (3d Cir. 2001).  The court must not engage in credibility determinations at the summary judgment stage.  *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 643 n.3 (3d Cir. 1998).

## III.    Jurisdiction and Venue

The Court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, 1343, and 42 U.S.C. § 2000e-5(f)(3).  Supplemental jurisdiction over Plaintiff's PHRA claims is predicated on 28 U.S.C. § 1367(a).  Venue is proper under 28 U.S.C. § 1391(b).

## IV.    Analysis

Plaintiff has alleged the following claims in her Complaint (ECF No. 1): Count I--violation of the PHRA against Defendant DOC; Count II--violation of the PHRA against Defendant Wingard; Count III--violation of Title VII of the Civil Rights Act of 1964 against Defendant DOC;

Count IV--violation of Civil Rights Act of 1871/42 U.S. C. §1983 against Defendant Wingard; and, Count V--violation of the Equal Pay Act against Defendant DOC.

Defendants seeks summary judgment as to all of Plaintiff's claims.  For the reasons set forth below, the Court finds that Defendants' motion is granted as to Plaintiff's PHRA claim against Defendant DOC at Count I, Plaintiff's Title VII wage-based discrimination claim against Defendant DOC at Count III, Plaintiff's wage-based discrimination and retaliation claims pursuant to Section 1983 against Defendant Wingard at Count IV, and Plaintiff's claims against Defendant DOC under the Equal Pay Act at Count V.  Defendants' motion is DENIED as to all remaining claims.

### A.  PHRA Claims

Plaintiff voluntarily withdraws her PHRA claims against the DOC (ECF No. 51 at p. 6). The Court agrees that Defendant DOC is immune from PHRA claims under the Eleventh Amendment.  *Mitchell v. Miller*, 884 F. Supp. 2d 334, 365 (W.D. Pa. 2012).

However, the PHRA does contemplate that an employee may be held liable for aiding and abetting the unlawful discriminatory practices of the employer.  Section 955(e) of the PHRA forbids "any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice…"  43 Pa. Cons. Stat. Ann. § 955(e).  Defendants contend Defendant Wingard cannot be held liable under the PHRA because Plaintiff failed to establish Defendant Wingard had authority to take adverse actions against Plaintiff such as suspension or termination, and was not responsible for determining her pay (ECF No. 45 at p. 9).  Defendants further contend there is no evidence Defendant Wingard personally took any discriminatory direct action against Plaintiff, nor is there evidence Plaintiff was discriminated against by any DOC employee under

13

Defendant Wingard's supervision, as Plaintiff complained of sexual harassment from third party inmates. *Id.* [2]

Plaintiff has pleaded sufficient facts to indicate Defendant Wingard did have authority regarding Plaintiff's employment, including the decision to ultimately fire rather than discipline her.  The record reflects Defendant Wingard had the authority to move the grievance boxes, reported Plaintiff to be investigated by OSII, scheduled the PDC panel, and ultimately chose to terminate Plaintiff (ECF No. 53 at ¶¶78-80).  Accordingly, Defendant Wingard is not entitled to summary judgment under a lack of authority basis as to Plaintiff's PHRA claims.

**B. Title VII Claims**

Title VII renders it unlawful "for an employer...to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Plaintiff's Count III asserts that DOC violated Title VII by 1) subjecting her to sexual harassment by failing to take corrective action to end "unlawful harassment" by male inmates; 2) discriminating against her on the basis of sex by paying her less than male counterparts performing the same work; and, 3) retaliating against her by taking adverse employment action because she engaged in protected conduct.

1. <u>Plaintiff's Title VII Sexual Harassment Claim</u>

---

[2]  Plaintiff correctly states this is the only basis on which Defendants have asserted they are entitled to summary judgment on Plaintiff's PHRA claims (ECF No. 45 at p. 9).  Despite opportunities to do so, Defendants have not briefed, nor otherwise raised, any argument to show they are entitled to summary judgment specifically as to Plaintiff's PHRA age-based claims against Defendant Wingard.  The Court therefore will not rule on that issue as it has not been appropriately raised or briefed by the parties.

When an employee alleges harassment by a co-worker, the employer can be liable only if it actually knew or reasonably should have known of the harassment. *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). Plaintiff's sexual harassment claim under Title VII alleges her employer, Defendant DOC, knew or should have known she experienced graphic and sexual harassment by inmates as she performed her job duties and that Defendant DOC failed to take reasonable, responsive actions (ECF No. 51 at p. 10).

As to Title VII claims involving harassment from nonemployees, "employers are merely held to a negligence standard for sexual harassment of employees by third parties." *Mongelli v. Red Clay Consol. Sch. Dist. Bd. Of Educ.*, 491 F. Supp. 2d 467, 475 (D. Del. 2007). "This theory of liability is grounded not in the harassing act itself…but rather in the employer's 'negligence and ratification' of the harassment through its failure to take appropriate and reasonable responsive action." *Guthrie v. Baker*, 583 F. Supp. 2d 668, 679 (W.D. Pa. 2008) (internal citation omitted). "The employer's responsibility is to provide its employees with nondiscriminatory working conditions. The genesis of inequality matters not; what *does* matter is how the employer handles the problem." *Id.* at 680 (quoting *Dunn v. Washington County Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005) (emphasis in original)).

Defendants contend they are entitled to summary judgment on Plaintiff's Title VII sexual harassment claim because, as Plaintiff did not file formal misconduct reports against specific inmates, Defendants did not have reason to be aware that Plaintiff viewed the inmates' comments as sexual harassment (ECF No. 45 at p. 11). Without this knowledge, Defendants contend they had no opportunity to take appropriate and reasonable responsive action on the issue and cannot be held liable under Title VII. *Id.* As this appears to be Defendants' only argument in support of

summary judgment on Plaintiff's sexual harassment Title VII claim, the Court will only address this argument.

Knowledge of harassment is imputed to the employer when "management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). At her deposition, Plaintiff testified she told her supervisor, Defendant Wingard, on multiple occasions about the harassment she was experiencing from the inmates. Notwithstanding that the Court must construe all facts in the light most favorable to Plaintiff at this stage, Defendant Wingard acknowledged at his deposition that he recalled conversations where Plaintiff complained to him about sexual harassment she was receiving from inmates at the institution, specifically that he believed she made a complaint or allegations that inmates were yelling names at her when she went into specific areas of the facility. The record shows that Defendant Wingard, Plaintiff's supervisor, was aware of the harassment, and this knowledge is therefore imputed to Plaintiff's employer, Defendant DOC. Plaintiff's failure to complete a misconduct report does not negate that Defendants had knowledge of the harassment.

The Court then must evaluate the remedial action the Defendants took to determine whether such action was "reasonably calculated to end the harassment." *Johnson-Harris v. AmQuip Cranes Rental, LLC*, No. 14-767, 2015 U.S. Dist. LEXIS 88736, at *23 (E.D. Pa. July 8, 2015) (internal citation omitted). It has been established that any remedial action taken by an employer in response to complaints of discrimination will be considered legally adequate when found to be "reasonably calculated to prevent further harassment." *Huston*, 568 F. 3d at 110 (quoting *Knabe v. Boury Corp.*, 114 F. 3d 407, 412 n. 8 (3d Cir. 1997)). However, this should not be taken to mean that an employer's investigation into discriminatory activity must be perfect — or even

16

adequate. *Knabe*, 114 F. 3d at 412.  Further, "even if a remedial action does not effectively end the alleged harassment, it may still be legally 'adequate' if it was 'reasonably calculated to do so.'" *Shatzer v. Rite Aid Corp.*, No. 13-233, 2015 U.S. Dist. LEXIS 107317, at *19 (W.D. Pa. Aug. 14, 2015) (internal citations omitted).

Defendant Wingard testified he did not recall making any adjustments or doing anything to address Plaintiff's complaints (ECF No. 46-4 at pp. 68-69).  Defendants suggest in a footnote that even if Defendants are deemed to have been aware that Plaintiff experienced inmate comments as sexual harassment rather than a simple nuisance, the only way to ensure Plaintiff did not experience any harassment from inmates would be for her to never enter the institution, and this would have been impossible as entering the institution is a critical component of the CSA's job responsibilities (ECF No. 45 at p. 11).  Though employees in the prison system are uniquely circumstanced to experience harassment from third party inmates, the Court declines to accept Defendants' argument as a matter of course that should act to bar Plaintiff's Title VII claims. Defendants do not point to any evidence of record that establishes the type of sexual harassment Plaintiff describes was unavoidable or was unable to be abated in any way.  The Court cannot conclude that taking no action, presumably on the basis of the inevitability of the sexual harassment from the inmates, entitles Defendant DOC to summary judgment as a matter of law on this claim.

2. Wage-based Discrimination

Defendant DOC contends it is entitled to summary judgment on Plaintiff's wage-based discrimination claims as Plaintiff did not suffer an adverse employment action with regard to her salary.  Plaintiff does not appear to have responded directly to Defendants' argument on this claim, and more importantly, the record does not contain evidence supporting Plaintiff's allegation that

Defendant DOC subjected her to sex discrimination in violation of Title VII by paying her wages at a lower rate than wages paid to men for performing similar work under similar conditions.

In responding to a motion for summary judgment, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In Defendants' Concise Statement of Material Facts, Defendants stated, "A direct correlation cannot be made between Plaintiff's salary and that of any male CSA because though they would have been subject to the same Executive Board Orders from the Governor's Office as to pay increases for management employees, no male CSA had the precise same level of seniority as Plaintiff and may or may not have received merit-based pay increases" (ECF No. 52 at ¶41). In her Counterstatement to Defendants' Concise Statement of Material Facts (ECF No. 52), Plaintiff stated only: "NOT MATERIAL. DISPUTED AS STATED. Contact staff were paid more and were able to retire earlier. ECF # 46-1 at p. 72-4." This reference relates to Plaintiff's deposition testimony where she stated she was discriminated against because she received lower pay since, in her position as a CSA, she was not designated as contact staff though she performed contact duties, and generally, women were CSAs. *Id.*

It is not entirely clear if Plaintiff opposes Defendants' argument for summary judgment on Plaintiff's Title VII wage-based discrimination claims, but there is insufficient evidence in the record to clearly support such a claim. Plaintiff has not established that any male employee with the same job responsibilities received greater compensation than Plaintiff on the basis of gender. Accordingly, the Court will grant Defendants' motion for summary judgment on Plaintiff's wage-based discrimination claims.

3.   Plaintiff's Title VII Retaliation Claim

Title VII makes it unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter…" 42 U.S.C. § 2000e-3(a).  To survive summary judgment on a retaliation claim, a plaintiff must first make out a *prima facie* case.  *Moore v. City of Philadelphia*, 461 F.3d 331, 340 (3d Cir. 2006).  This means that he must: "tender evidence that: '(1) []he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action.'"  *Id.* at 340-41 (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).  At the *prima facie* stage, a plaintiff need only proffer evidence sufficient to raise the inference that her engagement in a protected activity was the *likely reason* for the adverse employment action, not the but-for reason.  *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 253 (3d Cir. 2017) (emphasis in original).

If the employee establishes a *prima facie* case of retaliation, "the familiar *McDonnell Douglas* approach applies in which the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct."  *Moore*, at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)).  If the employer does so, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."  *Id.*  In other words, the plaintiff must show that the employer's proffered reason was a pretext for retaliation.  *Ashton v. SCI-Fayette*, No. CV 16-1795, 2018 U.S. Dist. LEXIS 98736, at *4 (W.D. Pa. June 13, 2018); *McKinney v. Univ. of Pittsburgh*, Civil Action No. 17-1389, 2018 U.S. Dist. LEXIS 211753, at *22-23 (W.D. Pa. Dec. 17, 2018). *See also Bray v. Marriott Hotels,* 110 F.3d 986, 990 (3d Cir. 1997) ("The plaintiff must produce evidence from which a reasonable factfinder could conclude either that the defendant's

proffered justifications are not worthy of credence or that the true reason for the employer's act was discrimination."). [P]laintiff must "cast sufficient doubt" upon defendants' proffered reasons to permit a reasonable factfinder to conclude that the reasons are fabricated. *See Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc).

For the third element of causation, a plaintiff may rely on "a broad array of evidence" to show the requisite causal link. *Kelly v. DeJoy*, Civil Action No. 19-204, 2021 U.S. Dist. LEXIS 44379, at *41 (W.D. Pa. Mar. 10, 2021) (internal citation omitted). Such evidence may include a temporal proximity between the protected activity and the adverse action, intervening antagonistic behavior on the part of the employer, inconsistencies in the employer's articulated reasons for taking the adverse action, or any other evidence that supports an inference of retaliatory animus. *Id.* As to the elements of her retaliation claim, Plaintiff testified she asked the grievance boxes to be moved because of the sexual harassment she was facing (ECF No. 53 at ¶38). Plaintiff argues this protected activity then subjected her to an investigation that ultimately led to her termination.

Plaintiff sent Defendant Wingard emails on March 6, 2017 and March 10, 2017, asking to move the grievance boxes. Though the emails do not state that Plaintiff wanted the boxes moved because of the sexual harassment she was experiencing, Plaintiff testified she verbally told Defendant Wingard at least five or six times she wanted the boxes moved because of the sexual harassment from the inmates. Defendants' apparent lack of knowledge of the basis for Plaintiff's request the grievance boxes be moved is therefore subject to dispute from Plaintiff's testimony.

Plaintiff contends that though Defendant Wingard was aware of Deem's allegations concerning the backdating at the latest on March 3, 2017, he did not report the allegations to his superior Glunt until March 13, 2017. Defendant Wingard testified he would have reported the

allegations within 24 hours, but the record shows Defendant Wingard only emailed Glunt after he received Plaintiff's email requests to move the grievance boxes, though Defendant Wingard indicated he may have spoken to Glunt earlier about the incident over the phone.  Defendant Wingard also ordered a PDC be convened on May 30, 2017, after he was informed on May 16, 2017 about Plaintiff's internal EEO complaint against him.

Further, though the OSII investigators indicated there had been several instances of backdating, the record before the Court only evidences Plaintiff's backdating occurred relating to the February 28, 2017 grievance forms (ECF No. 46-13).  Plaintiff has also produced evidence showing that backdating itself, even in situations with the dating of grievance appeals, was not an issue that would necessarily merit termination or even discipline with Defendant DOC.

Defendants differentiate these instances of backdating from Plaintiff's conduct by emphasizing that Deem indicated Plaintiff instructed her to backdate the grievance forms, "thereby instructing a subordinate to violate the Code of Ethics which is an even more serious offense than simply breaching the code oneself" (ECF No. 57 at p. 1).  Defendants contend this conduct amounts to Plaintiff attempting to coerce a subordinate into committing an ethics violation.  Deem testified at her deposition and at her interview during the OSII investigation that Plaintiff requested her to backdate the forms, but Plaintiff testified she had no recollection of providing that instruction to Deem and no recollection of stamping the grievance forms with the date February 28, 2017 (ECF No. 46-1 at p. 152).  The record shows that Defendant Wingard was present at Deem's interview by the OSII officers, and though Deem was not hired for Plaintiff's position following her termination, Deem did apply for the position.  Accepting Deem's version of the incident requires a determination of credibility, and the Court cannot engage in credibility determinations at the summary judgment stage.

Defendants contend though that backdating was only one part of the basis of Plaintiff's termination.  The OSII investigation also showed there were multiple dates where Plaintiff did not retrieve the grievance forms despite the fact her job duties required her to retrieve the forms daily. For context to the alleged seriousness of this failure, however, Plaintiff points out that the grievance forms are not picked up on weekends or holidays.  Further, the record also shows that SCI Somerset stopped date stamping the forms shortly after Plaintiff's termination.  Additionally, Defendant Wingard testified he was not aware of an instance where an inmate was injured as a result of a grievance not being picked up on the date it was submitted (ECF No. 52 at ¶13).

Taken as a whole, Plaintiff has produced sufficient evidence to establish the element of causation for her Title VII retaliation claim.  The Supreme Court has cautioned that the *prima facie* requirement for making a Title VII claim "is not onerous" and poses "a burden easily met." *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)*; see also Scheidemantle v. Slippery Rock Univ., State Sys. of Higher Educ.,* 470 F.3d 535, 539 (3d Cir. 2006).  The *prima facie* phase of discrimination litigation "merely serves to raise a rebuttable presumption of discrimination by 'eliminating the most common nondiscriminatory reasons for the employer's treatment of a plaintiff." *Burdine*, 450 U.S. at 253-54.  Plaintiff has met her *prima facie* burden by alleging that: (1) she engaged in protected activity; (2) Defendants then undertook an adverse employment action against her; and (3) a causal link exists between her complaints and her termination.  A reasonable juror would conclude, based on the evidence, that Plaintiff was ultimately terminated because of her complaints about the sexual harassment she was experiencing.

However, Defendants have likewise met their burden in advancing a legitimate, non-retaliatory reason for their conduct.  Defendants have an interest in ensuring that CSAs perform

the basic duties of their position by retrieving grievance forms daily and in ensuring that reports and documentation are accurate.  There is no dispute that backdating forms, and instructing a subordinate to backdate forms, constitute violations of Defendant DOC's policies and Code of Ethics.  The investigation of Plaintiff revealed she was regularly not picking up the grievance forms in a timely manner from the RHU pods.  The record also shows that Defendants concluded, after an investigation, that Plaintiff requested Deem backdate grievance forms.  Following an internal investigation, Defendant DOC's Human Resources Director, Ty Stanton, presented Defendant Wingard with the options of dismissal or a final warning, and Defendant Wingard chose to terminate Plaintiff.  A reasonable juror would conclude, based on the evidence, that the Defendants have established a nondiscriminatory reason for their conduct.

The burden then shifts back to Plaintiff to show pretext.  To defeat summary judgment at the pretext stage, Plaintiff must point to some evidence from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).  To discredit the employer's proffered reason, however, the plaintiff cannot simply show the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.  *Id.*  Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."  *Id.* quoting *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993)

(holding that the proper inquiry is whether the plaintiff has proffered sufficient evidence of "inconsistencies and implausibilities in the employer's proffered reasons").

Plaintiff's evidence used to show her *prima facie* burden is also relevant to the Court's analysis of whether Plaintiff has shown pretext. The *prima facie* case and pretext inquiries often overlap. *Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358, 370 (3d Cir. 2008). "As our jurisprudence recognizes, evidence supporting the *prima facie* case is often helpful in the pretext stage, and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other. *Id.* (internal citation omitted). The Court will not restate the evidence it analyzed above in determining Plaintiff's *prima facie* burden, but finds that Plaintiff's termination was based on credibility determinations and subjective discipline decisions which would allow a reasonable factfinder to rationally find Defendants' stated basis for Plaintiff's termination unworthy of credence.

A plaintiff may also demonstrate pretext under the second prong of *Fuentes* if she can demonstrate that discrimination "was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762. Pretext can be shown this way by producing evidence that: 1) the employer previously has discriminated against the plaintiff; 2) the employer has discriminated against other persons; or 3) the employer has treated more favorably similarly situated employees outside of the plaintiff's protected class. *See id.* at 765. To be considered similarly situated, comparator employees "must be similarly situated in all relevant respects." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011). "A determination of whether employees are similarly situated takes into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." *Id.* "Comparable seriousness may be shown by pointing to a violation of the same company

rule, or to conduct of similar nature." *Wright v. Providence Care Ctr., LLC*, 822 F. App'x 85, 93 (3d Cir. 2020) (internal citation omitted).

To that end, Plaintiff has produced employee records of other Defendant DOC employees who were determined to have falsified records or failed to complete their rounds, and Plaintiff argues that Defendant Wingard routinely imposed minimal discipline on those employees who engaged in conduct which was objectively much more severe than what Plaintiff was accused of (ECF No. 53 at ¶90). Plaintiff has produced evidence showing that other employees were not terminated for the following offenses: using excessive force against inmates, refusing to obey orders and abandoning post, fraternizing with an inmate, refusing to follow orders, "simulating sex on items in front of inmates and purposely bending over to touch your toes in front of intimates," harassing and intimidating other staff members, fighting with another staff-member, using profanity toward inmates, making inappropriate comments during pat searches, inappropriately and intentionally touching inmates, and physically assaulting another officer and abandoning post (ECF No. 53 at ¶90; ECF No. 54-19).

Defendants do not offer any argument to directly dispute the applicability of this comparator evidence, but assert that none of these employees directed a subordinate to commit an ethics violation (ECF No. 57 at p. 2). The Court notes also that the record shows several of these employees were not CSAs like Plaintiff and do not appear to have necessarily committed the same violations that led to Plaintiff's termination, though some of these employees appear to have engaged in conduct that is arguably more egregious.

Plaintiff, however, also highlights a 2013 incident involving CSA Jeffrey Rackovan (ECF No. 53 at ¶91). In that incident, a male prisoner at SCI Rockview violently raped a female DOC employee. *Id.* While investigating the cause of this assault, OSII determined that Rockview CSA

Jeffery Rackovan had repeatedly failed to conduct required weekly inspections of the unit where the rape occurred. *Id.* He completed only 13 of 35 required inspections in the six months preceding the rape and did not conduct any inspections during the three months before the assault. *Id.* Rackovan also routinely falsified inspection reports to make it appear as though he had performed the inspections. *Id.* Plaintiff contends that Rackovan's actions lead directly to the assault, and Rackovan's explanation for his actions were the same as Plaintiff's, i.e. that he became overwhelmed by his job duties and simply did not prioritize the inspections. *Id.* at ¶92. Defendant DOC's Bureau of Human Resources authorized Rackovan's supervisor to impose Level 2 ADLS or 20-30 day suspension with final warning. *Id.* at ¶93. Accordingly, in 2014, Rackovan was given "Level 2 ADLS" in lieu of suspension without pay, which had no impact on his pay, seniority or other benefits. *Id.* at ¶¶93-94. Termination was not an option provided by Defendant DOC.

Again, Defendants also do not directly dispute Plaintiff's reliance on Rackovan to show he is a similarly situated comparator who did not engage in protected activity but who received more favorable treatment. The record indicates that Rackovan worked at a different prison and was not supervised by Defendant Wingard, however, it does appear that Ty Stanton was the Acting Director of Human Resources for Defendant DOC when Rackovan received his final warning (ECF No. 54-23 at pp. 1-2). Rackovan also appears to have been in a similar position as Plaintiff as a CSA and failed to do similar job responsibilities.

When viewed as a whole and in the light most favorable to Plaintiff, Plaintiff has produced evidence that collectively undermines Defendants' representations of the seriousness of Plaintiff's backdating the grievance forms and failure to daily collect the forms and supports Plaintiff's contention that Defendants' stated basis for her termination was pretextual. Based on the record,

Plaintiff has cast sufficient doubt on Defendants' proffered reasons to permit a reasonable factfinder to conclude that the Defendants' basis for her termination is fabricated.

## C. Section 1983 claims

Plaintiff first alleges at Count IV that Defendant Wingard subjected her to sex discrimination in violation of the Equal Protection Clause of Fourteenth Amendment to the United States Constitution, pursuant to 42 U.S.C. §1983, by failing to take prompt and appropriate corrective action to end unlawful sexual harassment by male inmates of which Defendant Wingard was aware. Defendants argue they are entitled to summary judgment on this claim because Plaintiff cannot show there was a similarly situated group that Defendant Wingard treated differently with regard to preventing harassment by inmates against them, nor has Plaintiff demonstrated purposeful intent to discriminate even if there were a similarly situated group receiving protection she did not. *Kuhar v. Greensburg-Salem Sc. Dist.*, 616 F.2d 676, 677 n. 1 (3d Cir. 1980).

Plaintiff's Section 1983 claim against Defendant Wingard essentially mirrors her Title VII sexual harassment claim against Defendant DOC, namely, that she was subjected to severe sexual harassment by prison inmates, and Defendant Wingard failed to take prompt and appropriate corrective action to end the unlawful sexual harassment. Defendants' argument misstates Plaintiff's claim as Plaintiff is not claiming a gender-based discrimination claim under Section 1983 but, though not expressly labeled as such, appears to be asserting a hostile work environment claim under Section 1983.

The Third Circuit has been clear that Section 1983 shares the same elements for discrimination purposes as a Title VII action and that creating a hostile work environment constitutes a Section 1983 violation. *Starnes v. Butler Cty. Court of Common Pleas*, 971 F.3d 416, 428 (3d Cir. 2020) (internal citations omitted). "Similar to gender-based discrimination claims,

hostile work environment claims under the Equal Protection Clause follow the same framework established for Title VII hostile work environment claims." *King v. City of New Kensington*, Civil Action No. 06-1015, 2008 U.S. Dist. LEXIS 76485, at *61 (W.D. Pa. Sep. 30, 2008). "In order to prove a hostile work environment claim against an individual defendant, a plaintiff must show: (1) that… she suffered intentional discrimination because of [her gender]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same [gender] in that position; and (5) a basis for personal liability." *Pollock v. City of Phila.*, No. 06-4089, 2008 U.S. Dist. LEXIS 60764, at *22 (E.D. Pa. Aug. 7, 2008).

Under Title VII, a hostile work environment exists "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "[L]ess severe isolated incidents which would not themselves rise to the level of [discrimination] may, when taken together as part of 'the overall scenario,' evidence [discriminatory] animus, and one severe incident may be enough to create a hostile work environment." *Starnes*, 971 F.3d at 428 (3d Cir. 2020) (internal citation omitted).

Plaintiff has alleged she experienced daily graphic and violent sexual harassment by prison inmates. "The pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment." *Andrews v. Philadelphia*, 895 F.2d 1469, 1485 (3d Cir. 1990). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477

U.S. 57, 67 (1986) (internal quotations omitted). As previously stated when addressing Plaintiff's Title VII claims, to establish the last element of liability as to an employer, "employers are merely held to a negligence standard for sexual harassment of employees by third parties." *Mongelli v. Red Clay Consol. Sch. Dist. Bd. Of Educ.*, 491 F. Supp. 2d 467, 475 (D. Del. 2007). In this instance, viewing the evidence in the light most favorable to Plaintiff, she has established that Defendant Wingard was aware of the sexual harassment and did not take any action. Accordingly, the Court does not find that Defendants are entitled to summary judgment as to Plaintiff's discrimination claims under Section 1983 against Defendant Wingard.

Plaintiff also alleges Defendant Wingard subjected her to sex discrimination by paying her wages at a lower rate than wages paid to men for performing similar work under similar conditions. As previously stated in regard to Plaintiff's Title VII wage-based discrimination claim, Plaintiff has failed to point to any evidence to support that Plaintiff was paid less than male employees with the same responsibilities. Further, Plaintiff also has not pointed to any evidence to show that Defendant Wingard had any role in determining Plaintiff's salary.

Lastly, Defendants argue that Equal Protection Clause retaliation claims have not been recognized in the Third Circuit. *See Thomas v. Independence Twp.*, 463 F.3d 285, 297 (3d. Cir. 2006) and *Brennan v. City of Philadelphia*, No. CV 18-1417, 2018 WL 4566134, at *6 (E.D. Pa. 2018). "Our Courts have consistently viewed claims of wrongful termination resulting from expressive activity as claims of First Amendment retaliation." *See Wardlaw v. City of Philadelphia*, No. 09-3981, 2011 WL 1044936, at *6 & n.74 (E.D. Pa. 2011) (dismissing Fourteenth Amendment retaliation claim for conflating it with a First Amendment claim). "Pure or generic retaliation claim [] simply does not implicate the Equal Protection Clause." *O'Fee v.*

*City of Phila.*, No. 09-2724, 2009 U.S. Dist. LEXIS 92277, at *11 (E.D. Pa. Oct. 2, 2009) (internal quotations omitted).

Defendants correctly state that Plaintiff has not asserted a First Amendment claim against Defendants in her pleadings, which would be recognized as a valid basis for a retaliation claim pursuant to Section 1983. Plaintiff has not pointed to any authority to show that Defendants are not entitled to summary judgment on Plaintiff's retaliation claims under the Fourteenth Amendment against Defendant Wingard. Accordingly, the Court will grant Defendants' Motion for Summary Judgment as to Plaintiff's retaliation claims at Count IV.

### D. Equal Pay Act Claim

Plaintiff asserts at Count V that Defendant DOC violated Plaintiff's rights under the Equal Pay Act of 1963, 29 U.S.C. §206, *et seq*. by paying her wages at a lower rate than wages paid to men for performing similar work under similar conditions. An Equal Pay Act case also involves shifting burdens. *E.E.O.C. v. Delaware Dept. of Health and Social Services*, 865 F.2d 1408, 1413-4 (3rd Cir.1989). Again, though there is some evidence in the record relating to wages and salaries, Plaintiff has failed to establish a *prima facie* case by demonstrating that employees of the opposite sex were paid differently for performing "equal work"— work of substantially equal skill, effort and responsibility, under similar working conditions. *Id.* The Court will grant Defendants' Motion for Summary Judgment as to Plaintiff's claims under the Equal Pay Act.

### V.     Conclusion

For the reasons stated herein, the Court finds that Defendants' motion is granted as to Count I and Count V, and the Court will also grant Defendants' motion as to Plaintiff's wage-based discrimination claims under Title VII at Count III and Plaintiff's wage-based discrimination and retaliation claims alleged at Count IV. Defendants' Motion for Summary Judgment is denied as to all other claims.

An appropriate order will follow.

Stephanie L. Haines
United States District Judge


cc/ecf:  All counsel of record

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

HEIDI SROKA,                                    )
                                                )
                    Plaintiff,                  )
                                                )
          vs.                                   )    Civil Action No. 3:19-cv-45
                                                )    Judge Stephanie L. Haines
PENNSYLVANIA DEPARTMENT OF                      )
CORRECTIONS, et al.,                            )
                                                )
                    Defendants.                 )

## <u>ORDER</u>

AND NOW, this 20th day of August, 2021, for the reasons set forth in the accompanying

Opinion, IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (ECF No.

43) will be GRANTED IN PART and DENIED IN PART as follows:

1.   Defendants' motion is GRANTED as to Count I;

2.   Defendants' motion is GRANTED as to Plaintiff's Title VII wage-based discrimination
     claim at Count III;

3.   Defendants' motion is GRANTED as to Plaintiff's wage-based discrimination and
     retaliation claims pursuant to Section 1983 at Count IV;

4.   Defendants' motion is GRANTED as to Plaintiff's claims under the Equal Pay Act of
     1963, 29 U.S.C. §206, *et seq.*, at Count V; and,

5.   Defendants' motion is DENIED as to all remaining claims.


                                          Stephanie L. Haines
                                          United States District Judge

cc/ecf:  All counsel of record

                                    32